**DELL PUBLISHING CO., INC.,**
**Plaintiff,**

v.

**Julia WHEDON, Defendant.**

**No. 81 Civ. 2884 (JEL).**

United States District Court,
S.D. New York.

Jan. 11, 1984.

Satterlee & Stephens, New York City by Robert M. Callagy, for plaintiff.

Dornbush Mensch & Mandelstam, New York City by Dirk S. Roberts, for defendant.

## OPINION

LUMBARD, Circuit Judge: [*]

Dell Publishing Co. sues Julia Whedon to recover advances totalling $14,000 paid to Whedon for a manuscript it eventually rejected for publication as unsatisfactory in style, form and content. Plaintiff is a resident of New York and defendant of Massachusetts. Jurisdiction is therefore conferred by 28 U.S.C. § 1332.

[*] Sitting by designation.

The court finds that Dell was under a good faith obligation to give Whedon an opportunity to revise the manuscript to Dell's satisfaction, with Dell's editorial assistance. Having failed to do so, Dell itself was in breach of contract, and Whedon was entitled to retain the advances paid to her. The complaint against Whedon is dismissed.

The facts, established by testimony at trial, are undisputed. Whedon is a professional writer who, prior to any events connected with this suit, had published one novel, and numerous short stories, reviews and articles. In early 1974, Whedon, through her literary agent, Sterling Lord, presented a twelve-page outline for a proposed novel to various publishers, including Dell. The novel, tentatively titled *Over the Limit*, was to concern the dissolution of a marriage in a professional sports milieu.

On May 23, 1974, Dell and Whedon entered into a contract giving Dell exclusive publication rights to the novel. The contract provided in relevant part that:

¶ 2. The Author shall deliver ... the Work to Dell in form, style and content satisfactory to Dell on or before March 15, 1975. If the Author fails to so deliver, then the Author shall, at Dell's request, promptly return to Dell any payments made to the Author pursuant to this Agreement.

¶ 4. Dell agrees to pay to the Author the sum of $20,000.00 as a minimum guaranty in the following manner: $8,000.00 on the signing of this Agreement; $6,000.00 on acceptance of the first half of the manuscript by Dell; and $6,000.00 on acceptance of the completed manuscript by Dell.

All such payments are to be applied against ... royalties earned by the Author ...

Upon signing the contract, Dell paid Whedon $8,000.00, as stipulated in ¶ 4 of the contract.

Shortly afterward, Whedon met for the first time with Ellis Amburn, the editor at

Dell assigned to her book, to discuss the project in general terms. From 1974 until early 1977, Whedon worked on the manuscript. Her contact with Amburn was limited to one meeting and one or two phone conversations, the substance of which was not put in evidence at the trial, and a letter from Amburn to the Sterling Lord Agency, written around November 5, 1976, inquiring about the progress of Whedon's manuscript.

In early 1977, Whedon submitted to Amburn the first portion of the manuscript, representing roughly one-half of the completed manuscript.[1] According to Whedon, Amburn expressed enthusiasm about the manuscript, answered affirmatively the questions Whedon put to him concerning the effectiveness of particular characters and scenes, indicated no problems, and made no suggestions for revisions. Amburn did not testify at trial, and no evidence was produced by plaintiff to controvert that account. After the meeting, Whedon received an additional $6,000 from Dell, pursuant to the contractual provision for payment of an additional $6,000 upon acceptance of the first half of the manuscript.[2]

Whedon continued work on the manuscript without any further substantive communication with Amburn.[3] On or about February 10, 1978, Whedon, through Sterling Lord, submitted to Amburn the completed manuscript, which included the portion previously submitted and accepted in 1977, and new material of roughly equal length. After about ten days had passed and Whedon had not heard from Amburn, she called him. At trial, Whedon testified regarding that conversation and subsequent communications as follows:

Whedon: [I]t was a very awkward conversation in which he said, "I don't know, it's just not what we expected."

And I asked him, "What do you mean?" And he said, "it just isn't—I am just surprised. It just isn't what we expected."

And I asked him, "Ellis, you loved it before. What's happened? And he couldn't tell me. He just repeated himself in this way.

Roberts: (Attorney for defendant): Was there anything more that you can recall to the telephone conversation?

Whedon: Really not. It was quite brief and painful.

Roberts: Did Mr. Amburn indicate to you at any time in any more specific way what he believed the faults with the book were?

Whedon: No.

Roberts: Did he ever suggest to you that any revisions of any kind be made to your manuscript?

Whedon: Never.

Roberts: Did he ever provide you with any written critique or evaluation of the book?

Whedon: I never saw one.

Whedon also testified that no one else at Dell spoke to her then or subsequently about the reasons for their apparent unhappiness with the manuscript. Dell, again, presented no evidence controverting her testimony.

On March 7, 1978, Amburn indicated in a memo to the file that "We are declining the completed manuscript ... and asking for the return of the $14,000 paid. We are hereby cancelling the contract." Dell returned the manuscript to Sterling Lord at

1. There was disagreement at trial about whether the first portion was equal to one-half or two-thirds of the final manuscript submitted to Dell. Since the evidence at trial is insufficient to resolve that factual dispute, the court will assume that the portion submitted was one-half—the least favorable figure to defendant.

2. It is unclear from the record how much time elapsed between the submission of the first half of the manuscript and Dell's $6,000 payment to Whedon. However, since the check was deliv-

ered after Amburn met with Whedon to discuss the manuscript, and therefore presumably after he had read it, the payment is further evidence that Dell judged the first half to be satisfactory.

3. Whedon testified that she may have talked to Amburn once or twice during the period she was working on the second half of the manuscript, but that the conversations concerned her general progress and not any particular editorial suggestions.

that time. Shortly thereafter, at Whedon's request, Lord began marketing the manuscript again, under the new title *Time Out* but otherwise unchanged. Doubleday, the parent company of Dell but with separate editorial and business operations, and Atlantic Monthly Press both indicated interest. Doubleday accepted the book, and signed a contract with Whedon in April, 1978, at which time it paid Whedon a $15,000 advance. At about the same time, Dell wrote to Whedon, apparently offering to release her from her contractual obligations to Dell (i.e., her grant to Dell of sole rights to the manuscript) in exchange for return of the $14,000 advance. Whedon never agreed, and never obtained a written release from Dell.

Following acceptance of the manuscript, Whedon met with her Doubleday editor, Kate Medina, and, pursuant to Medina's editorial suggestions, added two chapters and made line changes on the balance of the manuscript. Medina then edited the revised manuscript and Whedon went over the suggested changes. The book was published in 1981, under the name *A Good Sport*, and received favorable reviews in the New York Times and the New York Times Book Review. Whedon received no royalties from Doubleday beyond the $15,000 advance.

In April, 1981, Dell filed this suit against Whedon to recover the $14,000 it paid Whedon as an advance, alleging that Whedon had violated ¶ 2 of her contract with Dell, by failing to deliver the manuscript within the time specified, i.e., March 15, 1975. In June, 1982, Dell amended the complaint, dropping the allegation of untimely delivery, and adding the charge that Whedon had failed to meet the other condition in ¶ 2, that she deliver to Dell a manuscript that was satisfactory to Dell in form, style and content.

A one-day bench trial was held November 2, 1983, at which plaintiff called as witnesses Whedon and Charles F. Adams, Jr., managing editor at Dell; and defendant called as witnesses herself and Richard Kluger, an author and former editor at Simon and Schuster, Atheneum, and Charter House Books.

■ The facts, as recounted above, were essentially undisputed at trial. Disagreement centers on the precise legal obligations running between Dell and Whedon under ¶ 2 of the contract, which gave Dell the right to reject the final manuscript if it was unsatisfactory *to Dell* in form, style or content. Defendant does not dispute that "to Dell" means to Dell's subjective satisfaction, and not to the satisfaction of this court, a jury, or a reasonable person. *See Random House, Inc. v. Gold,* 464 F.Supp. 1306, 1308–09 (S.D.N.Y.1979), *aff'd mem.,* 607 F.2d 998 (2d Cir.1979). Nor does defendant contend that Dell rejected the manuscript for any reason other than that it found it unsatisfactory. The sole issue in dispute is whether, before rejecting the manuscript as unsatisfactory, Dell had an implied good faith obligation to offer Whedon the opportunity to revise the manuscript, with Dell's editorial assistance, to bring it up to publishable standards. The court holds that Dell had such an obligation, which it failed to fulfill.

Had Whedon submitted an unsolicited manuscript to Dell, Dell would of course have the right to refuse it for any reason it wished. Plaintiff argues in essence that the only restriction imposed on that absolute right by the existence of a contract between Dell and Whedon was that Dell must have an honest (i.e., good faith) belief that the manuscript was unsatisfactory. The court disagrees. Before Dell ever took the book under contract, it had reviewed and approved Whedon's twelve-page outline for the book, on the strength of which it paid Whedon $8,000. When Whedon later submitted the first half of the manuscript, in accordance with that outline, Amburn expressed his unqualified enthusiasm, and paid Whedon the $6,000 due upon "acceptance" of the first half. There was never any suggestion that a change in form, content or style was necessary or even desirable in writing the remaining portion of the novel. Having induced Whedon to write the first half of the novel in reliance on its approval of the outline, and having induced her to complete the novel in reliance on its enthusiastic reception of and payment for the first half, Dell owed Whe-

don something more than simply an honest belief that the manuscript was unsatisfactory as written. It owed her, at the very least, a detailed explication of the problems it saw in the manuscript, and an opportunity to revise it along the lines its editors suggested.

That conclusion accords with industry practice, as established by testimony from defendant's expert witness.[4] It accords as well with Judge Griesa's holding in *Harcourt Brace Jovanovich, Inc. v. Goldwater*, 532 F.Supp. 619 (S.D.N.Y.1982). The publisher in that case, Harcourt Brace, had entered into a contract with Barry Goldwater and Stephen Shadegg, a professional writer, for publication of Goldwater's memoirs, after reviewing an outline submitted by the authors. The contract contained the standard "satisfactory to the publisher" clause provided in ¶ 2 of the Dell-Whedon contract. The editor assigned to the book reviewed sections of the manuscripts as they were submitted; while she had serious reservations about them and even contemplated replacing Shadegg with another co-author, she communicated none of her reservations to the authors and made no suggestions for revisions. After the completed manuscript was submitted to Harcourt Brace and reviewed negatively by several of its editors and a freelance reader, Harcourt Brace rejected it outright, without providing any editorial comments from which the authors could remedy the defects. On those facts, the court held that "there is an implied obligation in a contract of this kind for the publisher to engage in appropriate editorial work with the author of a book," and that Harcourt Brace, having "breached its contract with Shadegg and Goldwater by wilfully failing to engage in any rudimentary editorial work or effort," *id.*, at 624, 625, was not entitled to return of the monies it had advanced to the authors.

Plaintiff argues that this case is distinguishable from *Goldwater* on two grounds: that Dell, unlike Harcourt Brace, had evidenced no malice toward the author or lack of bona fide commitment to the contract prior to rejecting the manuscript as unsatisfactory; and that the work in question was a novel rather than nonfiction. The first distinction, even if true, is irrelevant, since the holding in *Goldwater* rests on the publisher's failure to provide any editorial assistance whatsoever, and not on the reasons for that failure. *Id.* at 624. On the second distinction, plaintiff argues that while the obligation to provide editorial assistance may be sensible for nonfiction works, where the author's value to the publisher lies chiefly in his or her unique access to facts, it is inappropriate when dealing with fiction, where the author's value lies chiefly in his or her peculiar writing skills. There is some merit to that distinction, but this court concludes it suggests a difference in degree, rather than kind, of editorial assistance a publisher is required to provide. That conclusion is corroborated by the testimony of defendant's expert witness that, while it is customary in the industry to "exercise[ ] one's editorial pencil rather more lightly with fiction than nonfiction," the editorial work done is of the same general nature in both cases. But as no editorial assistance whatsoever was provided by Dell, there is no occasion for the court to take into account any difference in the degree or nature of editorial assistance required of publishers before rejecting a work of fiction. The case therefore falls within the rationale of *Goldwater*. Furthermore, any suggestion that Whedon's manuscript was so bad as to be unsalvageable even with editorial comments and assistance from Dell is undercut by the subsequent sale of the manuscript to Doubleday, and its publication, apparently to the satisfaction of both parties, following normal editorial revisions undertaken jointly by Whedon and Doubleday's editor.

Plaintiff's reliance on *Random House, Inc. v. Gold*, 464 F.Supp. 1306 (S.D.N.Y.

---

**4.** Defendant's witness, Richard Kluger, testified that it is rare, if not unheard of, for a book to be published without any significant editorial changes, and that it is "inconceivable" to him, based on his experience in the industry, that a publisher would reject a completed manuscript written under contract, without first offering or providing some editorial assistance to revise it. *Accord Harcourt Brace Jovanovich v. Goldwater*, 532 F.Supp. 619, 624 (S.D.N.Y.1982).

1979), to compel a different conclusion is misplaced. While Judge Pollack's decision in *Gold* contains language suggesting that a publisher's view of a manuscript as unsatisfactory need only be held "honestly and in good faith," *id.* at 1309, the publisher in that case had apparently not seen any portion of the manuscript until it was completed, and upon reviewing it and finding it unsatisfactory, had communicated its criticisms to the author and given him an opportunity to revise it accordingly. Only after reviewing the revised manuscript did the publisher conclude that it was "unsatisfactory in form and content," and terminate the agreement under the "satisfactory to the publisher" provision in its contract. *Id.* at 1307–1308.

Having concluded that Dell was under a good faith obligation to provide editorial assistance to Whedon in revising the manuscript to make it satisfactory to Dell, this court finds that Dell clearly failed to meet that obligation. Whedon's testimony that she received no editorial assistance from anyone at Dell at any time after submitting the completed manuscript was unrebutted by plaintiff, and is confirmed by Amburn's memo to the file dated March 7, 1978, indicating an intention to reject the manuscript outright, and by Amburn's immediate return of the manuscript to Sterling Lord. After expressing unqualified enthusiasm about the first half of the novel and paying Whedon an additional $6,000 upon acceptance, Dell's sudden turn-about, without any reason given except vague generalities, and with no responsible representative to testify regarding the rejection, is surely evidence of a lack of good faith.

Dell indicated to the court that it had intended to call Ellis Amburn to testify, but was unable to do so because Amburn was in California at the time of the trial. In lieu of Amburn's appearance to testify, Dell attempted to put into evidence, under the Business Records exception to the hearsay rule, Fed.R.Evid. 803(6), memoranda from the editorial file that Amburn kept on the Whedon book, which pertained to Dell's review and rejection of the completed manuscript. The memoranda included two generally negative evaluations of the completed manuscript, allegedly written by two Dell editors reviewing the manuscript at Amburn's request, and Amburn's own comments on the completed manuscript, written to Ross Claiborne, editorial director of Dell, which were somewhat more equivocal but also generally negative. Dell apparently hoped to show by these internal memoranda that it had rejected the completed manuscript in the good faith belief that it was not fit for publication.

The documents were accepted for what they were worth, with decision reserved on their ultimate admissibility for the truth of the matter asserted. The court is now of the view that the documents do not properly fall within the Business Records exception.[5] However, even if

---

**5.** Rule 803(6) excepts from automatic exclusion as hearsay records "if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the ... record ..., all as shown by the testimony of the custodian or other qualified witness." While the witness need not have personal knowledge of the creation of the particular record in question, and need not have been in the employ of the company at the time the record was made, *United States v. Evans*, 572 F.2d 455, 490 (5th Cir.1978), he must be able to vouch from personal knowledge of the recordkeeping system that such records were kept in the regular course of business. *See Tashnizi v. Immigration and Naturalization Service*, 585 F.2d 781, 783 n. 1 (5th Cir.1978) (document inadmissible where witness had no personal knowledge of recordkeeping system, was clearly biased in favor of party seeking admission, and document was in his custody for limited purpose of submitting in evidence against petitioner). Charles F. Adams, Jr., Dell's managing editor, whose testimony Dell relied upon to lay a foundation for the admissibility of the memoranda, could state from personal knowledge only that *he* routinely kept editorial files on books he was editing, and that at least some of the other editors at Dell kept similar files. He was unable to state that Amburn routinely kept such files, or that Dell required that such files be kept by all editors. This court is of the opinion that that testimony was inadequate to establish the trustworthiness of the documents under the Business Records exception.

Furthermore, even if the authenticity of the documents were beyond question, it is doubtful that the documents themselves are of the sort that Rule 803(6) was intended to cover. While courts have taken an increasingly liberal view

they are accepted for their truth, at most they would prove that Dell honestly believed that the manuscript was unsatisfactory as written when it rejected it, a point not contested by the defendant and accepted by the court. Dell does not allege that it communicated to Whedon the criticisms contained therein and gave her an opportunity to revise the manuscript accordingly— the only allegation that would help plaintiff here. If the testimony of any of the authors of the memoranda would have enabled Dell to make that further showing, it had ample opportunity to depose Amburn, if he was unable to appear at trial, or to depose or call as witnesses any of the other editors involved.

The court therefore finds that Dell breached its implied obligation to provide Whedon with editorial commentary and the opportunity to revise accordingly. As a result, Whedon is released from any obligation to return the $14,000 advance.

■ Plaintiff makes the further argument that Whedon herself breached the contract by reselling the manuscript to Doubleday without first obtaining a release from Dell of its exclusive rights to the manuscript under ¶ 1 of the contract. The court disagrees. Once Dell materially breached its contract with Whedon by rejecting the manuscript outright, Whedon was discharged from her obligations under the contract, including the grant to Dell of exclusive rights in the manuscript. *See* Restatement (Second) of Contracts § 237 (1982); Corbin on Contracts § 1253 (2d ed. 1962 and Supp.1982). She was therefore free to resell the manuscript to whomever she wished. Furthermore, it is doubtful

that the contract, even if still in force against Whedon, would have prevented her from reselling the rights to Doubleday. The provision in question granted to Dell exclusive literary rights "during the full term of the copyright and all renewals, continuations and extensions thereof of the Work presently entitled OVER THE LIMIT." When read in conjunction with other parts of the contract setting forth Dell's obligations, it is clear that the provision would become operative only if Dell accepted the manuscript, registered the copyright, and published it within eighteen months of acceptance. Having failed to do any of the above, Dell may claim no rights under that provision.

■ Finally, Dell argues that Whedon was unjustly enriched by having retained the $14,000 advance from Dell while reselling the manuscript to Doubleday for $15,000. That argument would at the most pertain to $9,000 of the total of $29,000 she received in advances, since Whedon, prevented by Dell's nonperformance from fulfilling the complete terms of their agreement, was entitled to her full expectation interest under the agreement (i.e., $20,000 upon acceptance of the completed manuscript). *See* Restatement (Second) of Contracts §§ 243, 347 (1982); 4 Corbin on Contracts §§ 947, 992 (2d ed. 1951 and Supp. 1982). Furthermore, even as to the $9,000, plaintiff introduced no evidence that would enable the court to determine whether defendant was unjustly enriched by that sum. After Dell rejected the manuscript, defendant was required to locate another publisher, and then expend considerable effort in revising the manuscript to the new publish-

---

of the admissibility of business entries in the form of opinions, and Rule 803(6) was drafted expressly to cover recorded opinions, admission of recorded opinion evidence has been sought primarily in the area of medical diagnoses and laboratory reports, where the opinions concern objectively verifiable facts. *See, e.g., Thomas v. Hogan*, 308 F.2d 355 (4th Cir.1962) (blood test for intoxication); *Medina v. Erickson*, 226 F.2d 475, 482 (9th Cir.1955), *cert. denied*, 351 U.S. 912, 76 S.Ct. 702, 100 L.Ed. 1446 (1956) (cancer diagnosis); *cf. United States v. Bohle*, 445 F.2d 54, 64–66 (7th Cir.1971) (recorded diagnosis of mental condition excluded, because subjective

factors requiring judgment evaluations, and disagreements among experts, made safeguard of cross-examination essential); *Skogen v. Dow Chemical Co.*, 375 F.2d 692, 704–05 (8th Cir. 1967) (diagnosis that plaintiff's condition was due to insect spray poisoning excluded, since not based on directly observable facts or well-known tests and "not one that all persons skilled in the arts would likely reach"). Where, as here, the opinions merely record the readers' subjective evaluations of the quality of the manuscript, cross-examination is essential to fix the authors' precise meaning, their basis of comparison, and even the good faith of their judgments.

er's satisfaction. How much of that effort would have been necessary in any event, if defendant had published the manuscript with Dell, is a speculation the court is not prepared to make. Finally, plaintiff's argument presumes that the general principle that a seller may not retain double profits from resold goods, UCC §§ 2–706(1) and 708(1), except in the case of standard priced goods, UCC § 2–708(2), applies to the publishing industry. However, the two recent cases in this circuit dealing with twice-sold manuscripts have implicitly rejected that presumption. *See Random House, Inc. v. Gold, supra* (right of first publisher to recover advance decided without regard to advance from second); *Harcourt Brace Jovanovich, Inc. v. Goldwater, supra* (same).

Judgment for defendant.

SO ORDERED.