**DOUBLEDAY & COMPANY, INC., Plaintiff,**

v.

**Tony CURTIS, Defendant.**

**No. 82 Civ. 7888 (RWS).**

United States District Court, S.D. New York.

Dec. 17, 1984.

Satterlee & Stephens, New York City, for plaintiff; James F. Rittinger, New York City, of counsel.

Richard W. Meirowitz, New York City, for defendant.

## OPINION

SWEET, District Judge.

This is a dispute about creativity and the respective responsibilities of an author and his publisher. It takes the form of a diversity action by plaintiff Doubleday & Company, Inc. ("Doubleday"), a well known New York publishing house, which seeks to recover a $50,000 advance paid to defendant Tony Curtis ("Curtis"), a well known and well regarded actor. The advance was to be credited against the sales by Doubleday of a book by Curtis which was never published.[1] Upon the findings of fact and conclusions of law set forth below, judgment will be entered dismissing the complaint and Curtis' counterclaims.

**Prior Proceedings**

This hard fought and well litigated action was commenced on November 24, 1982. Curtis answered and counterclaimed seeking from Doubleday additional royalties due him from the sales of his prior book "Kid Andrew Cody and Judie Sparrow" (*"Kid Cody"*), previously published by Doubleday. Discovery with some attendant motions was conducted.

A six day non-jury trial took place from October 4 to 15, 1984 during which eight witnesses were heard and a number of exhibits admitted. Final arguments and briefs, proposed findings and conclusions were submitted on November 9, 1984. The findings and conclusions stated below are based upon those proceedings.

**Findings of Fact**

Curtis, a California resident, is an engaging and highly successful actor, who tried his hand at writing while in the midst of his successful acting career. By 1976 he had completed a manuscript which he submitted to Doubleday, a New York corporation with offices in the City in which it conducts a substantial publishing business. On February 18, 1976 Curtis and Doubleday signed an agreement which defined the rights of the parties with respect to two works by Curtis described as "1. Kid Andrew Cody, and 2. an untitled work." (the "1976 Agreement"). It is the submission and treatment of this second, then untitled, work which gives rise to the controversy.

This 1976 Agreement provided for the payment of advance royalties by Doubleday to Curtis of $12,500 upon signing the 1976 Agreement, $12,500 upon acceptance by Doubleday "of complete satisfactory manuscript for book # 1", and for similar payments on submission of an outline and acceptance of book # 2. Curtis' address was stated to be care of Aaron M. Priest Literary Agent, although Doubleday had corresponded with Irving Lazar ("Lazar"), known in the trade as Swifty, concerning

---

**1.** The work was known variously as *Starstruck* and *Stella Starstruck,* and all versions will be referred to as *Starstruck.*

the 1976 Agreement. The 1976 Agreement also contained the following provisions:

19. (a) Publisher shall render statements of sales semi-annually as of April thirtieth and October thirty-first and make payment of monies due within four months thereafter. If the work has not earned the amount of royalties advanced or Author has received an overpayment of royalties or is otherwise indebted to Publisher, Publisher may deduct the same from any sum due or to become due Author under this Agreement.

Curtis was also entitled to 50% of any monies received by Doubleday with respect to reprint sales.

Larry Jordan ("Jordan") was the editor assigned by Doubleday to work with Curtis, and their collaboration was successful. The manuscript for *Kid Cody* was accepted, the advance royalty was paid. The book was published, some 25,000 copies were sold, and royalties were paid and accounted for. While Curtis was writing *Kid Cody*, he was making notes and putting aside material for his second book.

In March 1977 Curtis had forwarded to Priest a 133 page manuscript described as "TC's latest novel, Starstruck." There is insufficient evidence from Curtis to establish that this manuscript was ever received by Doubleday, and Doubleday's files revealed no evidence of its receipt. In June, 1977 Curtis had an 8-page outline of *Starstruck* sent to Lazar, having come to a parting of the ways with Aaron Priest. Lazar forwarded the 8-page outline to Betty Prashker, a Doubleday editor, ("Prashker") commenting upon the previous submission to Jordan which had been deemed "as not being deemed satisfactory potential." Priest at the same time was communicating on the same subject with Stewart Richardson, the Doubleday editor, known in the trade as Sandy ("Richardson"), but Priest shortly afterwards bowed out in favor of Lazar. Curtis at the same time wrote to Jordan expressing gratitude for his past help and counsel and stating that "The second book will be an even more interesting experience for both of us." Curtis wrote a similarly optimistic letter to Richardson at the same time.

On August 16, 1977 Doubleday entered into a reprint contract with New American Library, Inc. ("NAL") under which NAL would acquire the paperback rights for Curtis' untitled book. NAL agreed to pay Doubleday $100,000 in equal installments upon the signing of the agreement, the delivery of the manuscript to NAL, and the publication by Doubleday and another $100,000 in two equal $50,000 payments upon publication by NAL and three months thereafter. The resale agreement provided that the anticipated delivery date of the accepted manuscript was December 31, 1979 and that NAL could terminate the agreement if delivery of the manuscript was not made by December 31, 1980.

On September 7, 1977, Curtis and Doubleday entered a second agreement, replacing the 1976 agreement with respect to the second book referred to in the 1976 Agreement. This replacement agreement (the "Agreement") provided that Curtis would receive an advance royalty of $50,000 at the time of the agreement and another $50,000 "on acceptance of complete satisfactory manuscript." As in the 1976 Agreement, Curtis was entitled to 50% of payments received from reprint sales. Like the 1976 Agreement the Agreement was on a printed form provided by Doubleday. It was negotiated on Curtis' behalf by Lazar, and its terms are central to the resolution of this action.

The Agreement contained no provision relating to editorial services to be provided by Doubleday but required in Paragraph 25(a) "two (2) finally revised copies of the work, satisfactory to Publisher in context and form, ... not later than October 1, 1978" and stated in Paragraph 25(d), "The provisions of subparagraphs (a) and (b) as to the character, condition and time of receipt of the copies of the work are of the essence of the agreement, and in the event of Author's default hereunder Publisher may, at its option, any time prior to actual publication of the work, terminate this

Agreement without prejudice to any other remedy."

By April 5, 1978 Curtis had a manuscript of 213 pages which he entitled *Starstruck* and sent to his friend Alan Carr for comments. Carr had no time for the project. At the same time Larry Jordan wrote to Curtis seeking to get "some definite fix on the new novel" and to straighten out a "promotional snafu around Kid Andrew Cody." Jordan suggested a more formalized editorial process, candid, open, and forthright. He suggested Richardson as an editor if Curtis preferred not to work with Jordan. A Doubleday inter office memo indicated that Curtis was expected to have "most of his next book STAR STRUCK (Working Title)" put together by Christmas of 1978. In January 1979 an editorial assistant to Richardson sought to get the date on which Curtis anticipated he would submit his new novel. Curtis' secretary indicated that Curtis would reach Richardson in March 1979 after finishing a film to arrange to get together on the book. No documents are presented by Doubleday or Curtis covering the period from early 1979 to early 1980. Curtis testified candidly and courageously as to difficulties involving both his personal and medical life during this period.

Early in 1980 Ted Macri, the subsidiary rights director of Doubleday, ("Macri") pointed out to Prashker the "200,000 early deal with NAL" and inquired as to the inheritor of the Tony Curtis line and whether the second book was "in the works," which, of course, it wasn't, at least as far as Doubleday was concerned. An assistant to Richardson made a similar inquiry to Lazar shortly thereafter. Lazar responded that Curtis expected to be in New York for about a year starting in March. On March 14, 1980 Macri had checked the NAL contract and advised Prashker that "we are obliged to publish the book no later than December 31, 1981." Richardson forwarded this news to Curtis on March 24 and by mid April Curtis undertook to send off "a goodly amount of pages" next week and by April 18 he did so, asking Richardson for "comments and suggestions."

Richardson sent Curtis' letter to Macri, who promptly obtained a one-year extension of the NAL contract so that Doubleday had until December 31, 1981 to receive the manuscript and until December 31, 1982 to publish.

Doubleday next responded to Curtis by a letter from Adrian Zackheim, a Doubleday editor, ("Zackheim") to Curtis dated August 21, 1980 in which he announced that Richardson "has recently departed from Doubleday rather abruptly" and that he, Zackheim, had been chosen to be Curtis' new editor and had received the manuscript that morning although it had been "in-house for several months." Zackheim wrote Curtis again on October 22, 1980 seeking forgiveness for tardiness resulting from a "succession of mini-crises" and on December 11, 1980 forwarded a seven-page letter to Curtis containing a number of editorial suggestions for *Starstruck* (the "editorial letter").

In February 1981 a New York trip by Curtis was the subject of correspondence. The trip took place in mid May. By inter office memo of May 6 Macri confirmed the NAL deadlines to Zackheim, stated the belief that NAL's enthusiasm was cooling, that no further extensions would be likely and suggested that if Curtis did not submit his revisions within eight weeks, permitting publication in the spring of 1982, that Doubleday "consider hiring a doctor to come in and smooth things out so that our $200,000 is fully protected."

Zackheim and Curtis met on May 18 in the evening for an hour or two. Notwithstanding Macri's warning, the conversation was largely social although the book was discussed. It was not a working meeting, no drafts were presented or discussed as such, and there was nothing said that cast any doubt upon the eventual publication of the book.

In June at Zackheim's request Doubleday forwarded $500 to Curtis to pay for the typing of his revisions undertaken in response to Zackheim's December editorial letter. By August 5 the revised draft of

the novel was forwarded. Upon reading the manuscript, Zackheim became concerned and asked Elizabeth Drew ("Drew"), then Executive Editor of Doubleday, to read it which she did.

On August 20 she responded to Zackheim with a memo which stated: "This is truly a terrible book .." After considering various alternative courses of action relating to the NAL reprint contract, Drew concluded in the same vein in which the one page memo began: "If I thought this were fixable, I'd try to help in any way I could, but it's a rotten book and we might as well face it." The manuscript was also read by Prashker who agreed with the Drew evaluation.

Zackheim called Lazar and told him that Doubleday would not publish. On September 30 Macri again suggested a "novel doctor," although he noted that it was an editorial matter but pointed out the need to resolve the reprint contract question. By October 5 Zackheim advised Prashker and Macri that Lazar had read the manuscript and told Zackheim that Curtis would not agree to a "ghost rewriter" and would not return the outstanding advance. On November 3 NAL advised Doubleday of their agreement that "the manuscript is unpublishable" and confirmed the Doubleday agreement to repay the monies previously received at the time of the execution of the reprint contract.

Zackheim proposed a termination agreement to Lazar which would have released all Doubleday's right upon receipt of the advance from Curtis. By the end of the year the dispute was in the hands of counsel where it has remained. Curtis has not sold the manuscript or paid back the advance. This action was commenced on November 29, 1982 and Curtis counterclaimed for royalties due under the 1976 Agreement for sales of *Kid Cody*.

## Conclusions

■ It is obvious on its face that the Agreement is a publisher's form and as such, favors Doubleday at every turn. The form of the Agreement, of course, simply follows the relative economic strength of a new, or untried author and an established publisher. For these reasons, as well as the accepted canons of construction, the Agreement must be construed strictly against the drafter. *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1207 (2d Cir.1970); *Prescott, Ball & Turben v. LTV Corp.*, 531 F.Supp. 213, 217 (S.D.N.Y.1981); *67 Wall Street Co. v. Franklin National Bank*, 37 N.Y.2d 245, 371 N.Y.S.2d 915, 333 N.E.2d 184 (1975).

The purpose of the Agreement is to regulate the creative process, place it in temporal bounds, provide for funds for the author as the work proceeds, and determine the rights of the publisher and the author with respect to acceptance, publication, royalty payments and the like. The Agreement is unitary, governing the rights of the parties and requires, as all contracts do, the good faith performance by both sides. *Lowell v. Twin Disc., Inc.*, 527 F.2d 767, 770 (2d Cir.1975); *T.G.I. East Coast Corp. v. Fireman's Fund Ins. Co.*, 534 F.Supp. 780, 782 (S.D.N.Y.1982).

■ Here the essence of the Agreement entered into in 1977 by its very terms was the delivery of a satisfactory manuscript by October 1, 1978. Failing such delivery, Doubleday was entitled to the return of its advance. However, the time of the essence provision with respect to the delivery of a satisfactory document was waived by Doubleday. As found above, Doubleday gave Curtis every reason to believe his manuscript would be published—up until the summer of 1981, almost four years after the advance had been paid. Doubleday thus not only waived its time of the essence delivery date, but also its right to the return of its advance in the event that it found the manuscript unsatisfactory.

There is no New York authority for the proposition just stated, and, of course, there is none with these facts holding to the contrary. It is therefore the task of this court, faced with a diversity case, to predict what a New York court would do if faced with this issue on these facts. *Cunninghame v. Equitable Life Assur. Soc. of*

*U.S.*, 652 F.2d 306, 308 (2d Cir.1981); *Marina Management Corp. v. Brewer*, 572 F.2d 43, 45–56 (2d Cir.1978).

Curtis has sought to obtain the same result, but by a different route. He urges *Harcourt Brace Jovanich Inc. v. Goldwater*, 532 F.Supp. 619 (S.D.N.Y.1982) and *Dell Publishing Co., Inc. v. Whedon*, 577 F.Supp. 1459 (S.D.N.Y.1984) in which District Judges (albeit one of them was a distinguished Circuit Judge, former Chief Judge, sitting as a District Judge) found a duty under New York law, outside the contract, that required a publisher to provide editorial services before finding a manuscript unsatisfactory. Neither court found any New York authority for this duty, and Doubleday has submitted *Stein & Day v. Morgan*, Index No. 158110/78 (Sup.Ct.N.Y. Co., May 29, 1979) and the jury instruction, dated March 14, 1984 in *Random House v. Howar*, Index No. 7252/82 (Sup.Ct.N.Y. Co.) for the proposition that the publisher's acceptance or rejection is within its own discretion and that there is no obligation to provide any editorial services. In the face of this state court authority, the creation of the obligation to provide editorial services may be equitable, but a question remains as to whether or not it is within the power of this court.

Even if a duty to provide editorial services is accepted as required under New York law, here Doubleday performed it. Curtis would have the court not only declare the existence of the duty to provide editing under the Agreement, although it contains no such provision, but also hold that editing provided by Doubleday in this instance was untimely and inadequate. It is Curtis' position that Doubleday failed to provide consistent editorial supervision, delayed more than six months in providing its editorial comments, and then rejected the manuscript in bad faith in August, 1981 because of its inability to meet the NAL reprint deadline.

Even if the duty to edit does exist, despite the doubts already expressed, the court is unwilling to rewrite the Agreement for the parties in that regard. While the confusion in editorial assignment and delay in its performance may well have been negligent, it violated no contractual provision. Similarly, while the personal chemistry between Curtis and Zackheim may have differed materially from that between Curtis and Jordan, Doubleday cannot be obligated to provide a satisfactory working relationship between its editor and the author as well as adhere to a court imposed schedule of performance.

Doubleday is most vulnerable to Curtis on the question of good faith, given the difference between Zackheim's view in December 1980 and the views of its editor in August 1981 and the possible effect of the NAL reprint contract deadlines. However, it was Lazar, Curtis' agent, that rejected a rewrite by a "novel doctor," and it was Doubleday that would have benefitted financially if not artistically, if *Starstruck* had been accepted. Any implication that the subject matter of the book (apparently the exploits, or exploitation of a starlet) was responsible for the rejection was not established by any evidence.

The testimony of Prashker and Drew was credible and unequivocal. Both genuinely believed *Starstruck* was a terrible book. Both were above Zackheim on the editorial ladder, and indeed Zackheim obviously had serious reservations when he received Curtis' rewrite. The decision to reject the manuscript was made in good faith, and was authorized under the Agreement.

Curtis has counterclaimed for his share of the NAL payments made in connection with the contemplated reprinting of *Starstruck*. Since Doubleday would become entitled to the funds only upon the effectuation of the reprint contract and indeed was obligated to return the funds to NAL after the contract was cancelled, the work did not earn the sums involved and Curtis is not entitled to the NAL payments.

In addition Curtis has sought to recover additional royalties arising out of the sales by Doubleday of *Kid Cody*. Doubleday had deducted its advance payments to Curtis under Paragraph 19(a) from royalties payable on sales. Curtis maintained

that Paragraph 19(a) should be construed to mean no deduction should be made if the sales by the publisher exceeded the amount of the advance.

The sought-after construction of the clause was not spelled out in this counterclaim or in the pretrial order, prior to trial except in general terms, was contrary to trade practice, according to Curtis' expert witness, and has to date not been so interpreted by authors, agents, publishers, or courts. The counterclaim for *Kid Cody* royalties is therefore dismissed.

Judgment will be entered in favor of Curtis in accordance with these findings and conclusions. No costs will be granted for either party.

IT IS SO ORDERED.