**DOUBLEDAY & COMPANY, INC.,**
Plaintiff-Appellant-Cross-Appellee,

v.

**Tony CURTIS,**
Defendant-Appellee-Cross-Appellant.

Nos. 1042, 1192, Dockets 85–7023, 85–7043.

United States Court of Appeals,
Second Circuit.

Argued May 1, 1985.

Decided May 22, 1985.

James F. Rittinger, New York City (Satterlee & Stephens, New York City, of counsel), for plaintiff-appellant-cross-appellee.

Richard W. Meirowitz, New York City (Jay A. Katz, Marchi, Jaffe, Cohen, Crystal, Rosner & Katz, New York City, of counsel), for defendant-appellee-cross-appellant.

Before KAUFMAN and VAN GRAAFEILAND, Circuit Judges, and LASKER, District Judge.*

IRVING R. KAUFMAN, Circuit Judge.

Mindful of the limited function of the judiciary in the private contractual realm, and aware of the dangers arising from judicial interference with the editorial process, we are today required to interpret an agreement entered into by an author and his publisher.

This dispute arose when, pursuant to the terms of a standard publishing agreement, Doubleday & Co. rejected as unsatisfactory a manuscript submitted by Tony Curtis. Each party then sued for breach of contract; Doubleday brought an action for recovery of the advance it remitted Curtis, and Curtis counterclaimed for anticipated earnings.

After a nonjury trial, the district court dismissed both actions. Judge Sweet rejected Curtis's claim, finding that Doubleday's unfavorable evaluation of the manuscript had been made in good faith and, assuming the publisher had a duty under

* District Judge, Southern District of New York, sitting by designation.

the contract to provide editorial assistance to Curtis, this obligation had been fulfilled. Doubleday's complaint was dismissed on the basis that the company had waived its right to demand return of its advance. For the reasons set forth below, we affirm the dismissal of Curtis's counterclaims, but reverse the dismissal of Doubleday's claim.

Before discussing the relevant legal principles, we believe they will come into sharper focus if we set forth the underlying facts and procedural history of this dispute.

## I.

### BACKGROUND

In the early 1970s, Tony Curtis, a respected dramatic and comedic actor, sought to enrich his career by becoming a novelist. He prepared a manuscript—later titled *Kid Andrew Cody and Julie Sparrow* ("Kid Cody")—and enlisted the aid of Irving Paul ("Swifty") Lazar, a well-known literary agent. Doubleday & Co., the venerable New York publishing house, foresaw within Curtis the potential for great commercial success and entered into a two-book contract with him in the winter of 1976.

As part of their arrangement, Doubleday promised to pay Curtis royalties on hardcover sales, and a share of the proceeds from the sale of subsidiary rights (e.g. paperback rights), provided Curtis could deliver—within a specified period of time—final manuscripts, "satisfactory to Publisher in content and form." The agreement was a standard industry form, and did not elaborate on the meaning of the penultimate condition—"satisfactory to Publisher in content and form."

Amid much fanfare, *Kid Cody* was accepted for publication. The final draft was generally acknowledged to have been a joint effort of Curtis and Larry Jordan, a Doubleday editor. Through a series of face-to-face meetings in New York, the experienced Jordan was able to assist the novice Curtis in the successful completion of his first novel.

Inspired by Curtis's literary debut and somewhat intrigued by an eight-page outline for his next novel, Doubleday agreed to renegotiate the contract governing publication of the second book. On September 7, 1977, the parties executed the document that spawned this litigation. Curtis was to receive one hundred thousand dollars as an advance to be charged against future royalties. One-half of the advance was paid upon the signing of the contract, with the balance due on "acceptance of complete satisfactory manuscript." In addition, Curtis was to receive fifty percent of any proceeds Doubleday might earn from the sale of reprint rights. Doubleday's performance was again contingent upon Curtis's ability to produce a "satisfactory" manuscript by a date no later than October 1, 1978. This deadline, as well as the conditions relating to acceptable "form" and "content," were expressly stated to be "of the essence of the Agreement." The document further stated that failure to comply with the satisfaction clause granted the publisher the right to terminate the contract, and require Curtis to return any sums advanced. As with the *Kid Cody* contract, this agreement did not speak to the methods and standards by which the publisher would determine whether a manuscript was "satisfactory." Indeed the contract omitted any reference to the plot, subject, title, length or tone of the proposed novel.

If Doubleday's arrangement with Curtis appeared to favor the publishing house, the company's subsequent reprint agreement with New American Library ("NAL") epitomized the firm's bargaining acumen. NAL promised to pay Doubleday $200,000 merely for the right to publish Curtis's second novel in paperback, in the event it was accepted for publication by Doubleday. NAL's position was thus wholly dependent upon Doubleday's opinion of the manuscript. Indeed, no matter how inferior or unsaleable the novel might prove to be, if Doubleday published the work before December 31, 1980, NAL was bound by the terms of the contract and Doubleday was ensured a handsome profit.

The great expectations that surrounded the project never materialized. It was not until April 1980 that Curtis delivered even a partial first draft of his would-be second novel, *Starstruck*, a rags-to-riches story of a lascivious Hollywood starlet. Doubleday appeared unperturbed, however, and blithely ignored the October 1978 deadline. Equally generous was NAL, which willingly extended its own deadline one year to December 31, 1981.

Those portions of *Starstruck* that Curtis had forwarded to Doubleday were routed from one editor's desk to another, finally coming to rest in August 1980 with Adrian Zackheim, then a stranger to Curtis. Zackheim's review of the first half of *Starstruck* was slow but painstakingly thorough. After four months of intermittent reading—totaling perhaps fifty hours—he sent Curtis a seven-page letter. In it, Zackheim criticized the numerous inconsistencies and inherent contradictions that pervaded the manuscript and exhorted Curtis to tighten the plot. Yet, sprinkled among this criticism was praise for the author's story-telling ability. To this end, Zackheim emphasized he was generally "charmed" with the "wonderful possibilities" of *Starstruck* and was not expecting substantial changes in "the basic outlines of the novel."

The following months, however, did not prove conducive to *Starstruck's* completion. The few telephonic and face-to-face conversations between Curtis and Zackheim contrasted dramatically with the considerable contact Curtis had maintained with Larry Jordan. To a large extent, the dearth of communication was a product of circumstance rather than neglect. Curtis was preoccupied with complex divorce proceedings, and his visits to New York became more and more infrequent. Zackheim, for his part, was willing to review changes and additions piecemeal, but Curtis eschewed this alternative.

The spring of 1981 elapsed without any significant progress being made on the manuscript. As a result, Doubleday executives became increasingly anxious that they would be unable to accept *Starstruck* for publication before the December 31, 1981 deadline with NAL. The prevailing sentiment at Doubleday was that it would prove fruitless to appeal to NAL for a further extension.

In early August, Curtis finally forwarded to Zackheim what he represented to be a completed draft of the book. Zackheim was appalled at the product, and reluctantly concluded that *Starstruck* was unpublishable. Not only had Curtis ignored suggestions involving the story's first half, but he had composed such an unexpectedly poor conclusion that *Starstruck* was transformed from a potential success into an almost certain debacle.

Without apprising Curtis of his impressions, Zackheim asked his supervisor at Doubleday, Elizabeth Drew, to read the revised manuscript.[1] Drew's response, in the form of an intrafirm memorandum, clearly demonstrates the dilemma then confronting Doubleday. She acknowledged that rejecting *Starstruck* would require forfeiture of the lucrative reprint arrangement with NAL, but nonetheless recommended that Doubleday abandon the book. In her opinion, *Starstruck* was "junk, pure and simple," and could not be "edited into shape or even rewritten into shape." To accept the manuscript for publication solely because of the NAL contract was, in Drew's words, "not a way to sleep nights, at least not if one's concerned with ethics."

As a final means of salvaging the book and the NAL deal, Zackheim approached Lazar and suggested that Curtis submit the manuscript to a "novel doctor" in an attempt to put the shine back on the fallen *Starstruck*. When Lazar demurred, Doubleday finally admitted defeat. It cancelled the reprint deal with NAL, formally terminated the September 1977 agreement with Curtis and demanded repayment of the original $50,000 advance. When Curtis

---

1. Although Zackheim was authorized to reject *Starstruck* on his own, he felt uncomfortable doing so in light of Doubleday's "no lose" agreement with NAL.

refused, Doubleday commenced this litigation.

## Proceedings in the District Court

Invoking the diversity jurisdiction of the federal courts, Doubleday filed a complaint on April 3, 1983 in the United States District Court for the Southern District of New York, claiming Curtis breached the 1977 contract and seeking recovery of its $50,000 advance. Curtis, in turn, counterclaimed for breach of the agreement, and sought $150,000. Curtis alleged, both as a counterclaim and as an affirmative defense, that Doubleday's failure to provide adequate editorial services—a duty derived from its implied obligation to perform in good faith—prevented him from completing a satisfactory manuscript. He contended that had Doubleday followed "the usual and customary editorial process," *Starstruck* would have been published and he would have received a second $50,000 advance, as well as fifty percent of the $200,-000 reprint sale to NAL.

The parties' positions remained constant throughout discovery and were restated with only some embellishment in the district court's pretrial order. With a single exception,[2] the evidence adduced at trial conformed to the original pleadings. Judge Sweet presided over a six-day nonjury trial in October 1984. At trial, as in a prior deposition, Curtis bitterly recounted his experiences with Doubleday. Not only did he regard Zackheim as an apathetic and incompetent editor by comparison to Larry Jordan, but he was also particularly distressed by the duplicity in which he believed Doubleday had engaged. Until he was informed by Lazar of Doubleday's irreversible decision to reject the book, Curtis claimed he had not received the slightest indication that *Starstruck* would not be accepted for publication.

Curtis's lament was basically corroborated by Zackheim, who admitted overstating the first draft's strengths and minimizing its weaknesses. At the same time, Zackheim asserted that his carefully considered suggestions were all but ignored by Curtis, and that the second half of the manuscript was abysmal. Both Zackheim and Drew testified that they had sincerely believed Curtis's completed manuscript was irreparable. In light of Curtis's refusal to surrender *Starstruck* to a "novel doctor" and the impending deadline with NAL, the editors testified that their decision to terminate the contract was motivated by both ethical and artistic considerations.

## The Decision of the District Court

Characterizing the litigation as a "dispute about creativity and the respective responsibilities of an author and his publisher," the district court dismissed Doubleday's complaint and Curtis's litany of counterclaims. 599 F.Supp. 779 (S.D.N.Y.1984). In considering whether to infer a duty to edit from a clause requiring delivery of a manuscript "satisfactory to the publisher," the court acknowledged that New York's appellate courts had yet to resolve this issue. Without deciding the issue, Judge Sweet concluded that, "[e]ven if a duty to provide editorial services is accepted as required under New York law, here, Doubleday performed it." *Id.* at 784.

Turning to the question of bad faith, the trial judge deemed the testimony of Doubleday's witnesses credible, and held that the decision to reject Curtis's manuscript had been animated by a genuine belief that *Starstruck* was unpublishable. Curtis's remaining counterclaims were summarily dismissed as contrary to the relevant provisions of the 1976 and 1977 contracts.

Finally, the court dismissed Doubleday's claim seeking recovery of the $50,000 advance. Judge Sweet held that Doubleday had waived the "time of the essence" clause by accepting Curtis's manuscript

---

**2.** The one deviation arose from Curtis's counterclaim that he was owed money from Doubleday for royalties earned on the first book. Counsel for Doubleday objected to the tardiness and the frivolity of this claim. The district judge agreed that the counterclaim had not been raised in a timely fashion, but noted that litigating the point would not prejudice Doubleday. Consequently, he permitted the claim to proceed.

nearly eighteen months after the original deadline had passed. Moreover, the court found that because Doubleday had led Curtis to believe that *Starstruck* would eventually be published, it had also waived its right to a return of the advance even if it found the manuscript unsatisfactory.

## II.

### DISCUSSION

#### A. *The Publisher's Duty to Perform in Good Faith.*

■ We note at the outset that Curtis has never defended his August 1981 manuscript as a work of publishable quality. Rather, Curtis maintains that but for Doubleday's inability and unwillingness to provide adequate editorial assistance, *Starstruck* would have met the "satisfactory to publisher" condition. Curtis concedes that his proposed interpretation is not supported by a literal reading of the 1977 agreement. On its face, the document is completely silent regarding any obligation on Doubleday's part to ensure that Curtis's rough drafts are transformed, through the company's affirmative efforts, into a polished novel.

Our task, then, is to delineate the extent to which New York law requires us to infer such an obligation from the agreement. Because New York's appellate courts have not yet addressed this question, we must attempt to divine the likely response of our state brethren.

The 1977 agreement expressly granted Doubleday the right to terminate the contract if it deemed Curtis's manuscript to be unsatisfactory. In similar circumstances— where the satisfactory performance of one party is to be judged by another party— New York courts have required the party terminating the contract to act in good faith. In *Baker v. Chock Full O'Nuts Corp.*, 292 N.Y.S.2d 58, 30 A.D.2d 329 (1st Dep't 1968), for example, where payment to an advertiser was contingent upon the client's "satisfaction" with the completed promotional campaign, the court implied a requirement that the client terminate its arrangement only if motivated by " 'an honest dissatisfaction with the performance.' " 292 N.Y.S.2d at 62, 30 A.D.2d at 333 (*quoting* 3A A. Corbin, *Contracts* § 647 at 104 (2d ed. 1960)).

This principle—that a contract containing a "satisfaction clause" may be terminated only as a result of honest dissatisfaction— would seem especially appropriate in construing publishing agreements. To shield from scrutiny the already chimerical process of evaluating literary value would render the "satisfaction" clause an illusory promise, and place authors at the unbridled mercy of their editors.

A corollary of this duty to appraise a writing honestly is an obligation on the part of the publisher not to mislead an author deliberately regarding the work required for a given project. A willful failure to respond to a request for editorial comments on a preliminary draft may, in many instances, work no less a hardship than would an unjustifiable rejection of a final manuscript. A publisher's duty to exercise good faith in its dealings toward an author exists at all stages of the creative process.

Although we hold that publishers must perform honestly, we decline to extend that requirement to include a duty to perform skillfully. The possibility that a publisher or an editor—either through inferior editing or inadvertence—may prejudice an author's efforts is a risk attendant to the selection of a publishing house by a writer, and is properly borne by that party. To imply a duty to perform adequate editorial services in the absence of express contractual language would, in our view, represent an unwarranted intrusion into the editorial process. Moreover, we are hesitant to require triers of fact to explore the manifold intricacies of an editorial relationship. Such inquiries are appropriate only where contracts specifically allocate certain creative responsibilities to the publisher.[3]

---

**3.** Our views comport with the principles we previously articulated in interpreting a standard

Accordingly, we hold that a publisher may, in its discretion, terminate a standard publishing contract, provided that the termination is made in good faith, and that the failure of an author to submit a satisfactory manuscript was not caused by the publisher's bad faith.

### B. *Doubleday's Good Faith.*

■ Evaluating the Doubleday-Curtis relationship in light of these principles, we are convinced that *Starstruck's* failure was not attributable to any dishonesty, willful neglect or any other manifestations of bad faith on the part of Doubleday. The factual landscape illustrates the complete frustration experienced by Doubleday's editors, who were forced to harmonize an inferior manuscript, a lucrative reprint agreement and a recalcitrant author. Zackheim sincerely endeavored to assist Curtis in the completion of his manuscript. Although Zackheim's suggested revisions may have been offered somewhat belatedly, the evidence indicates that he extended numerous offers to discuss the novel with Curtis, as well as to review portions of the second draft. Indeed, it was Curtis who refused these renderings of assistance. That Zackheim's editing was perhaps inadequate is beside the point, as is any comparison with Larry Jordan. Curtis neither alleged, nor does the record support a finding that Doubleday deliberately or even recklessly assigned *Starstruck* to an editor unfit or unsuited for the project.[4]

Admittedly, the selection of an editor is a matter of paramount importance to a writer, but we note once again that the power to control this decision—like all aspects of the publication process—could have been reserved to Curtis in his contract.[5]

Turning our attention to the actual termination of the contract, we believe the district court's finding that Doubleday rejected *Starstruck* in good faith is amply supported by the record before us. Zackheim and Drew were in complete agreement that no amount of in-house editing could save the project. Moreover, the suggestion that Curtis consult a "novel doctor"—though perhaps somewhat humiliating—appears to have been made sincerely, rather than as a stratagem for avoiding the responsibilities attendant to a difficult editing job.[6]

publishing contract under New York law. In *Zilg v. Prentice-Hall Inc.*, 717 F.2d 671 (2d Cir. 1983), we reversed a judgment entered against a publisher for failing to promote a book adequately. In that case, the contract left the number of copies to be printed and the level of advertising expenses within the unfettered discretion of the publisher. Accordingly, we required only that the publisher make an initial good faith effort to promote the book and exercise good faith business judgment in evaluating promotional decisions. *Id.* at 680. Any greater obligation, we cautioned, would hamper the "publisher's ability to rely upon its own experience and judgment in marketing books." *Id.*

The concerns expressed in *Zilg* are no less compelling with respect to standard "satisfactory to the publisher" clauses. Clearly, such agreements are drafted with the intention of foreclosing the possibility that a publisher's editorial decision could be later questioned by a disgruntled writer or be "subject to second guessing ... as to whether it ... [was] sound or valid." *Id.*

4. We pause briefly to comment on the false optimism generated by Zackheim and expressed to Curtis, concerning the likelihood that *Starstruck* would be accepted for publication. We recognize that an editor might inhibit a propitious working relationship by emphasizing the failings of a particular manuscript—particularly in an early draft—and warning the author of possible rejection. Nevertheless, it would be perverse if outright prevarication were insufficient to demonstrate bad faith. In any event, we need not dwell on Zackheim's overly encouraging communications to Curtis, because there is no indication that they prejudiced the author's efforts. In fact, they may well have inspired Curtis to persevere.

5. Indeed, Curtis's own expert witness at trial admitted that an author's desire to work with a particular editor is often achieved by making that preference an explicit condition of the publishing contract.

6. Curtis relies on two district court decisions that denied publishers recovery of their advances after rejecting manuscripts as "unsatisfactory." *Dell Publishing Co. v. Whedon*, 577 F.Supp. 1459 (S.D.N.Y.1984); *Harcourt Brace & Jovanovich v. Goldwater*, 532 F.Supp. 619 (S.D. N.Y.1982). Although both decisions appear to recognize a duty on the part of publishers to provide adequate editorial services, the results reached in those cases are consistent with the framework we have adopted. In marked con-

Curtis argues with some force that Doubleday terminated his contract in November 1981 primarily because of the impending NAL deadline. Although we agree the two events were not unconnected, we choose to characterize the relationship between them quite differently. Were it not for the extremely lucrative arrangement with NAL, it is likely that Doubleday would have abandoned *Starstruck* without hesitation, and perhaps at a much earlier date. Only the prospect of a commercially profitable reprint deal prevented Zackheim from rejecting the August 1981 manuscript immediately. Doubleday's decision to sacrifice financial reward for "ethics," as Zackheim's superior Drew framed the choice, can hardly be said to constitute an act of bad faith.

In light of all the circumstances, we agree with the district court's finding that Doubleday exercised good faith in its dealings with Curtis, and thus affirm the dismissal of Curtis's counterclaim.[7]

## C. Doubleday's Action For Return of the Advance.

■ In dismissing Doubleday's complaint, which sought recovery of the $50,000 advance paid to Curtis, the district court found that Doubleday had waived its right to demand return of the advance. Because the issue was not properly before the court, we conclude dismissal on that basis was improper.

---

trast to the supervision Zackheim offered Curtis on *Starstruck,* the authors in *Whedon* and *Goldwater* received no response to their requests for guidance and assistance in the preparation and revision of their manuscripts.

7. We also affirm the dismissal, without costs, of Curtis's other counterclaims, all of which Judge Sweet ruled were contrary to the relevant contract provisions as well as industry custom.

8. The only evidence introduced that did not conform to issues previously raised related to Curtis's newly formed counterclaim concerning royalties earned on his first book. The fervor with which Doubleday's lawyer attacked this late claim is indicative of how vigilantly he guarded his client's position in the litigation.

Among the cardinal principles of our Anglo-American system of justice is the notion that the legal parameters of a given dispute are framed by the positions advanced by the adversaries, and may not be expanded *sua sponte* by the trial judge. The dismissal of Doubleday's claim based on an issue never pleaded by Curtis—or even implicitly raised at trial—is inconsistent with the due process concerns of adequate notice and an opportunity to be heard. Moreover, such a result runs counter to the spirit of fairness embodied in the Federal Rules of Civil Procedure.

There can be little doubt that Doubleday received no notice that its claim was subject to challenge on the basis of waiver. At trial, in the pleadings and in the pretrial order, Curtis claimed only that he was prevented from completing the manuscript because of Doubleday's bad faith.[8] The district court's finding of waiver appears to have been grounded on Doubleday's decision to ignore the October 1, 1978 deadline, and its conclusion that "Doubleday gave Curtis every reason to believe his manuscript would be published." The first point—the failure to enforce the deadline—was undisputed,[9] and the second appears to state the defense of estoppel rather than waiver. Although we choose not to question the validity of the district court's reasoning regarding the issue of notice to Doubleday, we deem the district judge's observation concerning the novelty of his holding to be highly relevant: "There is no New York authority for the proposition

9. While we do not reach the issue of whether Doubleday waived its right to recover its advance, it appears that under New York law the waiver of a "time of the essence" provision in a contract ordinarily has no other result than to convert the contract into one in which performance must take place within a reasonable period of time. *See Schenectady Steel v. Bruno Trimpoli Gen. Constr. Co.,* 43 A.D.2d 234, 237, 350 N.Y.S.2d 920, 923 (App.Div. 3d Dept.), *aff'd,* 34 N.Y.2d 939, 316 N.E.2d 875, 359 N.Y.S.2d 560 (1974); *see also Gould v. Bantam Books, Inc.,* No. 83 Civ. 5121(LBS), slip op. (S.D.N.Y. July 31, 1984).

just stated." 599 F.Supp. at 783. The fact that certain evidence relating to the issues raised in the pleadings and pretrial order may have been relevant to a defense of waiver is inconsequential. We have previously noted that neither notice nor consent can fairly be inferred from such circumstances. *See Usery v. Marquette Cement Mfg. Co.*, 568 F.2d 902 (2d Cir.1977) (stipulation to facts relevant to one theory insufficient to imply consent to litigate on different theory). Accordingly, we conclude that, in dismissing the complaint on the basis of waiver, the district court violated Doubleday's right to fair notice. *See Jiminez v. Tuna Vessel Granada*, 652 F.2d 415, 422 (5th Cir.1981).

Moreover, the district court's actions run afoul of the procedural safeguards embodied in the Federal Rules of Civil Procedure. Rule 8(c) provides: "In pleading to a preceding pleading, a party shall set forth affirmatively ... waiver, and any other matter constituting an avoidance or affirmative defense." The rule is intended to notify a party of the existence of certain issues, and its mandatory language has impelled us to conclude that a party's failure to plead an affirmative defense bars its invocation at later stages of the litigation. *See Satchell v. Dilworth*, 745 F.2d 781, 784 (2d Cir.1984). In this case, of course, it was the trial judge—rather than Curtis—who raised the waiver defense, but the result and the underlying rationale remain the same. If Curtis had already waived the right to litigate the issue, he obviously could not win his case on that point.[10]

Therefore, the district court's dismissal of Doubleday's claim to recover its advance violated the spirit of both the United States Constitution and the Federal Rules of Civil Procedure.

### III.

### CONCLUSION

Accordingly, we affirm the district court's dismissal of Curtis's counterclaims. We reverse the judgment of the district court dismissing Doubleday's complaint and remand the cause with instructions to enter judgment in favor of Doubleday for recovery of its $50,000 advance, plus interest.

---

**10.** Neither can Curtis benefit from Rule 15(a), which permits, in certain circumstances, retroactive amendment of the pleadings. The district court did not grant, nor did Curtis ever move for an amendment pursuant to 15(a).

Reliance upon 15(b) is equally unavailing. That Rule states: "When issues not raised by pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Rule 15(b) appears to mandate making a motion to amend, yet it also provides that "fail-

ure so to amend does not affect the result of the trial of these issues." We need not determine whether this provision is self-executing, because Doubleday was neither aware of, nor did it consent to litigate, the waiver issue. *See Usery, supra*, 568 F.2d at 907. As we stated in *Browning Debenture Holders' Comm. v. DASA Corp.*, 560 F.2d 1078, 1086 (2d Cir.1977), "the purpose of Rule 15(b) is to allow the pleadings to conform to issues actually tried, not to extend the pleadings to introduce issues inferentially suggested by incidental evidence in the record."