[Cite as *Ocwen Loan Servicing, L.L.C. v. Malish*, 2018-Ohio-1056.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| OCWEN LOAN SERVICING, LLC | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27532 |
| | : | |
| v. | : | Trial Court Case No. 16-CV-178 |
| | : | |
| RONALD K. MALISH, et al. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendants-Appellants | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 23rd day of March, 2018.

. . . . . . . . . .

KIMBERLY Y. SMITH-RIVERA, Atty. Reg. No. 0066849, and STEFANIE L. DEKA, Atty.
Reg. No. 0089248, 25550 Chagrin Boulevard, Suite 406, Cleveland, OH 44122
        Attorneys for Plaintiff-Appellee

ANDREW M. ENGEL, Atty. Reg. No. 0047371, 7925 Paragon Road, Dayton, Ohio 45459
        Attorney for Defendants-Appellants

. . . . . . . . . . . . .

HALL, J.

{¶ 1} Ronald and Janis Malish appeal from a summary judgment of foreclosure rendered for Ocwen Loan Servicing, LLC. We find no error, so we affirm.

## I. Background

{¶ 2} The Malishes executed a promissory note in 2006 in favor of GMAC Mortgage, LLC f/k/a GMAC Mortgage Corporation for $231,647, secured by a mortgage on their residential property. Later, the Malishes and GMAC entered into a loan modification agreement. In 2013, the mortgage was assigned to Ocwen.

{¶ 3} Ocwen filed a complaint in foreclosure against the Malishes in 2016, alleging that they had defaulted on the note and owed $246,349.54, plus interest, late fees, advances, and various expenditures recoverable under the note and mortgage. Ocwen then moved for summary judgment. Attached to its summary-judgment motion is an affidavit from loan analyst, Crystal Kearse. The affidavit states that when Ocwen took over the Malishes' loan, it acquired GMAC's loan records and incorporated them into its own records. The affidavit states that Ocwen relies on those GMAC records. Attached to the affidavit are the note and mortgage, the mortgage assignments, the loan modification agreement, a notice of default, a mortgage statement, Ocwen's payment history, GMAC's payment history, and GMAC's comment logs. The affidavit states that in August 2015 Ocwen sent the Malishes the notice of default by certified mail. Thereafter, states the affidavit, the Malishes failed to cure the default, the loan was accelerated, and the unpaid balance is $246,349.54 plus interest, late charges, and advances for real estate taxes, hazard insurance premiums, and property protection, as well as costs and expenses allowed by law. The Malishes moved to strike the payment histories and the related

averments from Ocwen's affidavit. The trial court did not rule on the motion.

{¶ 4} The Malishes opposed summary judgment with an affidavit from Ronald Malish. Malish avers that he never received the notice of default and never signed for the certified mail. He attached to his affidavit a printout from the United States Postal Service's website that shows the tracking information for the certified mail sent by Ocwen. Malish further avers that the monthly amounts Ocwen demanded they pay were higher than the monthly amount stated in the loan modification agreement. Malish also avers that Ocwen representatives told him that he was paying too much and that his payments were being misapplied to the loan.

{¶ 5} The trial court entered a judgment of foreclosure for Ocwen. The Malishes appealed. We determined that the judgment entry is not a final, appealable order because it fails to state the amount of the liens held by the Ohio Department of Taxation. On remand, on March 14, 2017, the trial court entered an amended judgment entry.

{¶ 6} The Malishes appealed from the amended judgment, and that appeal is now before us.

## II. Analysis

{¶ 7} The Malishes present two assignments of error. The first argues that the trial court should not have overruled their motion to strike portions of Ocwen's affidavit. And the second assignment of error argues that the court should not have entered summary judgment for Ocwen.

### A. The Amended Judgment Entry is a final, appealable order.

{¶ 8} One of the Malishes' contentions in the second assignment of error is that the amended judgment entry is not a final, appealable order. Because this is a

jurisdictional issue, we address it first.

{¶ 9} The Malishes argue that the damage award in the amended judgment entry—the foreclosure order—is not specific enough. The order pertinently states: "The Court further finds that based on the evidence, Ocwen is due on the promissory note the amount of $246,349.54 plus interest on the outstanding principal amount at the rate of 2.0% per annum, subject to adjustment, from April 1, 2015, plus late charges and advances and *all costs and expenses incurred for the enforcement of the Note and Mortgage except to the extent the payment is prohibited by Ohio law*, for which sum judgment is hereby rendered in favor of Ocwen." (Emphasis added.). The Malishes say that the italicized language prevents the foreclosure order from being final and appealable, for three reasons. First, "costs and expenses" are not defined. Second, say the Malishes, no specific amount is awarded for costs and expenses. And third, the order does not say which costs and expenses are lawful.

{¶ 10} The Ohio Supreme Court said in *CitiMortgage, Inc. v. Roznowski*, 139 Ohio St.3d 299, 2014-Ohio-1984, 11 N.E.3d 1140, that "for a judgment decree in foreclosure to constitute a final order, it must address the rights of all lienholders and the responsibilities of the mortgagor." *Roznowski* at ¶ 20. A foreclosure judgment does this if it "forecloses on the mortgage, sets forth the principal sum and interest accrued on the note, and lists the categories for future expenses for which the [mortgagors] will be liable." *Id.* at ¶ 22. Although the focus in *Roznowski* is a foreclosure judgment that awards unspecified amounts advanced by the mortgagee, the Court's rationale applies equally to an award of costs and expenses incurred to enforce a note and mortgage. It is enough that "all damages for which the [mortgagors] are responsible are established, and only

the amount is subject to clarification." *Id.*

{¶ 11} As the Court explained, the foreclosure order is one of two judgments that is appealable in a foreclosure action. The later order of confirmation of sale may also be appealed. "A mortgagor that contests amounts expended by a mortgagee for inspections, appraisals, property protection, and maintenance may challenge those amounts as part of the proceedings to confirm the foreclosure sale and may appeal the order of confirmation." *Id.* at ¶ 35. The same is true of enforcement expenditures. A mortgagor may challenge the inclusion of particular expenditures—whether because an expenditure is invalid or unlawful—and the amounts awarded.

{¶ 12} We note that the note and mortgage here allow Ocwen to recover those "costs and expenses incurred for the enforcement of the Note and Mortgage." Paragraph 6(E) of the note, "Payment of Note Holder's Costs and Expenses," states: "If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law." And paragraph 9 of the mortgage, "Protection of Lender's Interest in the Property and Rights Under this Security Instrument," states that "[a]ny amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Interest." The paragraph states that these amounts may include "whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument," which can include "appearing in court." Ocwen will be awarded enforcement costs and expenses in the confirmation-of-sale order. At that time, the Malishes will have an opportunity to challenge the award and raise the issues they raise here.

{¶ 13} As it is, none of the issues they raise prevent the amended judgment entry from being final and appealable.

## B. The trial court properly overruled the Malishes' motion to strike Ocwen's affidavit.

{¶ 14} The first assignment of error alleges that the trial court erred by overruling the Malishes' motion to strike GMAC's payment history and Ocwen's payment history and the related averments from Ocwen's affidavit supporting its summary-judgment motion. The Malishes argue that the affidavit does not properly authenticate the GMAC payment history and that Ocwen's payment history contains hearsay.

{¶ 15} The trial court did not expressly rule on the motion to strike. But in its decision, the court relied on the payment histories to find that Ocwen met its summary-judgment burden. So the court, by granting summary judgment, implicitly overruled the Malishes' motion to strike. The question is whether it erred by doing so.

{¶ 16} "Authentication of business records is governed by Evid.R. 803(6), the hearsay exception for business records." *U.S. Bank, N.A. v. Christmas*, 2d Dist. Montgomery No. 26695, 2016-Ohio-236, ¶ 16, *vacated on other grounds*, 146 Ohio St.3d 1468, 2016-Ohio-5108, 54 N.E.3d 1267, citing *Great Seneca Financial v. Felty*, 170 Ohio App.3d 737, 2006-Ohio-6618, 869 N.E.2d 30, ¶ 9 (1st Dist.). The exception states that, even though it contains hearsay, a business record is admissible if it satisfies these requirements:

A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly

conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. * * *

To satisfy the authentication requirement in the business-records exception, "the testifying witness must possess a working knowledge of the specific record-keeping system that produced the document * * * [and] 'be able to vouch from personal knowledge of the record-keeping system that such records were kept in the regular course of business.' " *State v. Davis*, 62 Ohio St.3d 326, 343, 581 N.E.2d 1362 (1991), quoting *Dell Publishing Co., Inc. v. Whedon*, 577 F.Supp. 1459, 1464, fn. 5 (S.D.N.Y.1984).

{¶ 17} The Malishes argue that Ocwen failed to satisfy the authentication requirement as to the GMAC payment history. They say that neither Ocwen's affidavit nor any other evidence sufficiently establishes the manner in which GMAC prepared or kept its payment-history records.

{¶ 18} At issue here is the rule for admitting adopted business records, that is, records that were created by a third party, here GMAC, a predecessor in interest, that have been incorporated into the business records of the assignee, here Ocwen, who seeks admission.

{¶ 19} The Malishes rely on this Court's decision in *Ohio Receivables, L.L.C. v. Williams*, 2d Dist. Montgomery No. 25427, 2013-Ohio-960, to support their argument that Ocwen failed to satisfy the authentication requirement. In *Williams*, this Court addressed

the issue of adoptive business records in the context of credit-card debt. In that case, the bank "charged off" the outstanding balance on the defendant-appellant's credit card by selling the account, along with hundreds of other accounts. The purchasing company in turn sold the account, along with hundreds of others, to the plaintiff-appellee. The plaintiff then filed suit against the defendant in an attempt to collect the debt. The plaintiff moved for summary judgment, supporting its motion with affidavits from its agents regarding the assignments of the defendant's debt and the amount owed. The trial court sustained the motion, and the defendant appealed.

{¶ 20} The defendant had opposed summary judgment in part on the grounds that the plaintiff's supporting affidavits were not based on personal knowledge, that "personal knowledge gained from a review of business records, without the presentation of evidence about the creation of those records, was insufficient," and that the plaintiff's " 'mere acquisition' of documents from other companies did not make those documents business records of [the plaintiff] within the meaning of the business records exception to the hearsay rule." *Williams* at ¶ 4. The plaintiff filed a reply to which it attached additional affidavits, from employees of the bank and the first purchaser of the defendant's debt.

{¶ 21} After reviewing the plaintiff's supporting affidavits, we concluded that the documents attached to the affidavits were not properly authenticated. We said that employees of the plaintiff could not attest to the facts that the contract documents between the defendant and the bank reflected the terms of the credit-card agreement, the documents were made at or near the time that the account was opened by someone with knowledge of that transaction, or the billing statements and spreadsheets were generated in the regular course of the bank's business. In the absence of first-hand knowledge of

the transaction at issue, we said, the plaintiff had to prove by some other means that the documents on which it relied were business records of the bank. That is, the plaintiff had to prove that the documents were first business records created and maintained by the bank in the course of its (the bank's) regularly conducted business. We concluded that the plaintiff's affidavits stating that the documents were received from the bank as part of the series of purchases of the defendant's account were insufficient to prove this fact.

{¶ 22} One of the arguments made by the plaintiff in *Williams* was that the bank's records were admissible as business records because the plaintiff had incorporated and relied on them in its own business dealings, citing *Air Land Forwarders, Inc. v. United States*, 172 F.3d 1338 (Fed.Cir.1999). We noted that the court in *Air Land Forwarders* held that repair estimates produced by third parties and submitted by military service members in support of claims for loss and damage to property were "business records" of the military and fell within the hearsay-rule exception. This holding, we said, was based on the fact that the business incorporating the third-party records relied on the accuracy of the records and that there were other circumstances indicating the records' trustworthiness. But "[w]e have no such circumstances in this case," we said. *Williams* at ¶ 29. We also said that it did not appear that the plaintiff relied on the bank's records in its business, "except to the extent that it uses them as a basis for this and other lawsuits." *Id*. The plaintiff's "business endeavor is merely to collect on the debt, not to receive or process payments, send bills, record charges, and the like." *Id*. Ultimately, in *Williams* the plaintiff debt collector received the history records from the bank solely for the purpose to collect the debt and not to operate an ongoing business of debt service.

{¶ 23} The rule for admitting adopted business records that we applied in *Williams*

does not apply here. This is also a mortgage-foreclosure case not a debt-collection case. And in mortgage-foreclosure cases, we have applied a different rule: "a court may admit a document as a business record even when the proffering party is not the maker of the document, if the other requirements of Evid.R. 803(6) are met and the circumstances suggest that the record is trustworthy." *U.S. Bank, N.A. v. Christmas*, 2d Dist. Montgomery No. 26695, 2016-Ohio-236, ¶ 18, *vacated on other grounds*, 146 Ohio St.3d 1468, 2016-Ohio-5108, 54 N.E.3d 1267, citing *Great Seneca Financial v. Felty*, 170 Ohio App.3d 737, 2006-Ohio-6618, 869 N.E.2d 30, ¶ 14 (1st Dist.); *Secy. of Veterans Affairs v. Leonhardt*, 2015-Ohio-931, 29 N.E.3d 1, ¶ 57 (3d Dist.); *State Farm Mut. Auto. Ins. Co. v. Anders*, 197 Ohio App.3d 22, 2012-Ohio-824, 965 N.E.2d 1056, ¶ 24 (10th Dist.). "Trustworthiness of a record is suggested by the profferer's incorporation into its own records and reliance on it." *Christmas,* 2016-Ohio-236, ¶ 18, citing *Leonhardt* at ¶ 58. "Because 'if information is sufficiently trustworthy that a business is willing to rely on it in making business decisions, the courts should be willing to rely on that information as well.' " *Id.*, quoting *Quill v. Albert M. Higley Co.*, 2014-Ohio-5821, 26 N.E.3d 1187, ¶ 44 (5th Dist.) (referring to this as the rationale behind the business-records exception), citing 1980 Staff Note, Evid.R. 803(6).

{¶ 24} We applied this rule in *U.S. Bank, N.A. v. Christmas*, a case in which the defendants argued that the third-party business records attached to the plaintiff's affidavit were improperly authenticated because the affiant did not know anything about the circumstances in which the prior servicer of the mortgage created them. We concluded that the records were admissible under Evid.R. 803(6). The affiant stated that she had personal knowledge of the current servicer's record-keeping system and that the records

attached to the affidavit were kept in the regular course of the servicer's business. Although the affiant did not explicitly state that the records were incorporated into the servicer's own records, we said that the fact that the records were in the servicer's records was sufficient to show incorporation, as the defendants submitted no evidence to the contrary. We noted too that the servicer plainly relied on the incorporated records in its business of servicing loans. And we saw nothing that indicated that the source of the information in the records or the method or circumstances of their preparation was untrustworthy.

{¶ 25} Here, Ocwen's affidavit states that its business records, including those records relating to the Malishes' loan, were made "at or near the time by, or from information transmitted by, a person with knowledge" and that the records were "kept in the ordinary course of Ocwen's regularly conducted business activity." The affidavit further states that "Ocwen fully incorporated the business records of the prior servicer into its records" and that Ocwen "relies upon these records in the ordinary course of business." And the affidavit states that, for around ten months after it acquired the Malishes' loan, "Ocwen continued to use GMAC's servicing platform for all activity on the Malishes' account." Ocwen is in much the same business as GMAC and plainly relies on GMAC's records in its business. Ocwen is not a debt collector but a mortgage servicer. And the fact that after Ocwen began servicing the Malishes' loan it continued using GMAC's servicing platform shows an ongoing relationship between the two businesses. We see nothing that indicates that the source of the information in the records or the method or circumstances of their preparation was untrustworthy. The GMAC payment history is properly authenticated and is admissible under the business-records hearsay exception.

{¶ 26} The Malishes also argue that Ocwen's payment history is inadmissible because it contains embedded hearsay. But this argument is premised on the conclusion that the GMAC payment history is inadmissible: the Malishes say that Ocwen's payment history is based entirely on the inadmissible GMAC payment history. We have concluded that the GMAC records satisfy the business-records hearsay exception, so Ocwen's records do not present a hearsay problem.

{¶ 27} The trial court did not err by overruling the Malishes' motion to strike the payment histories attached to Ocwen's affidavit or the related averments.

{¶ 28} The first assignment of error is overruled.

### C. There is no genuine issue of material fact.

{¶ 29} The second assignment of error alleges that the trial court erred by rendering summary judgment for Ocwen. The Malishes contend that there is a genuine issue as to whether Ocwen complied with all the conditions precedent to foreclosure. They also contend that there is a genuine issue as to the amount due.

{¶ 30} Appellate courts review summary-judgment awards using a de novo standard. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). "Under Civ.R. 56(C), summary judgment is proper if there is no genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law, and reasonable minds, after construing the evidence most strongly in favor of the nonmoving party, can only conclude adversely to that party." *Christmas*, 2016-Ohio-236, at ¶ 9, citing *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369-370, 696 N.E.2d 201 (1998).

{¶ 31} "To properly support a motion for summary judgment in a foreclosure action, a plaintiff must present evidentiary-quality materials showing: (1) the movant is the holder

of the note and mortgage, or is a party entitled to enforce the instrument; (2) if the movant is not the original mortgagee, the chain of assignments and transfers; (3) the mortgagor is in default; (4) all conditions precedent have been met; and (5) the amount of principal and interest due." *JPMorgan Chase Bank, N.A. v. Chenoweth*, 2d Dist. Montgomery No. 25953, 2014-Ohio-3507, ¶ 20.

**{¶ 32}** "[T]he moving party bears the initial burden of demonstrating that there are no genuine issues of material fact concerning an essential element of the opponent's case. To accomplish this, the movant must be able to point to evidentiary materials of the type listed in Civ.R. 56(C) that a court is to consider in rendering summary judgment." *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). Once the moving party meets its initial burden, the nonmovant must set forth specific facts demonstrating a genuine issue for trial. *Id.* at 293. "In a foreclosure proceeding, when the lender moves for summary judgment, submitting an affidavit in support of its motion, and then the borrower submits an affidavit rebutting an allegation made by the lender regarding a material issue of fact, the court must view this evidence in the light most favorable to the borrower and find that there is a genuine issue of material fact." *Wells Fargo Bank, N.A. v. Scott*, 2d Dist. Montgomery No. 26552, 2015-Ohio-3269, ¶ 15.

**{¶ 33}** The Malishes argue that Ocwen did not satisfy all the conditions precedent to foreclosure because it failed to give them written notice of default as required by the note and mortgage.

**{¶ 34}** Both the note and mortgage here require that written notice of default be given to the Malishes before Ocwen may foreclose. Ocwen's summary-judgment affidavit states that written notice of default was sent to them on August 14, 2015, at the property

address via certified mail. The notice is attached to the affidavit and bears the same date and address and states that it was sent via certified mail.

**{¶ 35}** Ronald Malish states in his opposing affidavit that he did not receive the notice of default. In support of this statement, he attached to his affidavit a printout from the website of the United States Postal Service (USPS) that shows the tracking information for the certified mail sent by Ocwen. Citing the printout (Exhibit 1) and the notice of default (Exhibit G), Malish avers:

4. I did not receive Exhibit G by certified mail, and it was never delivered to my house. I never signed for certified mail from Ocwen at any time around August 14, 2015. I have never seen Exhibit G before.

5. When I reviewed Exhibit G, I wanted to make sure that my memory was correct and that I never received Exhibit G. I visited the United States Post Office website to check the certified mail tracking number that is listed on Exhibit G. The information on the website confirmed my memory that I never received Exhibit G, and it was never delivered to my house. I attach Exhibit 1, which is a printout from the USPS website that shows the USPS tracking for Exhibit G. It reflects that the certified mail was not delivered to me and was returned to Ocwen.

**{¶ 36}** The printout shows that the notice of default was sent on August 14, 2015. The post office attempted to deliver the notice to the Malishes' home on August 18 but could not because, according to the printout, "No Authorized Recipient [was] Available." So the post office left notice at the Malishes home that it had certified mail for them. The Malishes still had not claimed the default notice when the "Max Hold Time Expired" on

August 24, so the post office returned the notice to Ocwen.

{¶ 37} Accordingly, the Malishes contend that the notice of default was never delivered to them like the note and mortgage require. Regarding delivery of notice, the note states:

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above * * *.

(Note, ¶ 7). And the mortgage states:

Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. * * *

(Mortgage, ¶ 15).

{¶ 38} The Malishes argue that because Ocwen sent the default notice by certified mail and not first-class mail, it had to "deliver[]" the notice to them. They say that the post office merely leaving notice that it has certified mail did not satisfy this requirement.

{¶ 39} The Malishes rely largely on *National City Mortgage Co. v. Richards*, 182 Ohio App.3d 534, 2009-Ohio-2556, 913 N.E.2d 1007 (10th Dist.), to support their argument that Ocwen failed to satisfy the notice requirements. In *Richards*, the Tenth District held that notice of default sent by certified mail that was returned as "undelivered" did not satisfy a delivery requirement in a note and mortgage substantively identical to the requirement in the note and mortgage here. The court concluded that no presumption of delivery arose and that even if a presumption had arisen, the presumption was rebutted

by the evidence that the certified mail was returned unclaimed. The court also rejected the argument that the post office's attempts to deliver the certified mail qualified as delivery. "Delivery," said the court, "presumes the giving or yielding of possession or control to another." *Richards* at ¶ 29. "Notification that certified mail is being held for a recipient is undeniably distinct from delivery of the certified-mail contents." *Id.*

{¶ 40} We conclude *Richards* does not apply here. Unlike the evidence in *Richards*, the evidence here shows that certified mail *is* first-class mail. The Malishes' tracking-information printout they submitted from the USPS website shows that certified mail is simply enhanced first-class mail. Under the heading "Postal Product" is stated "First-Class Mail." And beside this under the heading "Features" is stated "Certified Mail." This indicates that certified mail is basically a service that can be added-on to first-class mail. It stands to reason that a sender purchases this service if the sender wants to ensure that the first-class mail gets to the recipient. Therefore, because Ocwen sent the notice of default to the Malishes by first-class mail, the notice must be "deemed to have been given" when it was sent on August 14, 2015.

{¶ 41} We note too that the evidence suggests that the only reason that the Malishes did not actually receive the notice of default was because they failed to retrieve it from the post office. In his affidavit, Malish is careful to avoid saying that he did not receive the post office's notice that certified mail was being held. The Malishes simply ignored the notice of certified mail.[1] This is akin to a person simply ignoring a piece of mail left in his mailbox, or not opening an unpleasant letter. This is likely why the mortgage

---

[1] Standard USPS procedure for certified mail is to twice leave or send a peach Form 3849 notice that the post office will "will redeliver OR you or your agent can pick up your mail at the Post Office."

deems undesirable mail, like a notice of default, is given when it is sent and, unlike the more formal civil rules, the mortgage terms contain no requirement of ordinary mail redelivery.

{¶ 42} The Malishes fail to show a genuine issue of fact as to whether Ocwen satisfied all conditions precedent to foreclosure.

{¶ 43} The Malishes also contend that there is a genuine issue as to the amount of principal and interest due. They contend that Ocwen demanded monthly payments higher than the monthly payment required by the loan modification agreement and failed to post the payments to their account properly.

{¶ 44} Ronald Malish states in his affidavit that under the loan modification agreement the total monthly payment was to be $1,518.66 but that Ocwen demanded more and that Ocwen failed to properly post the payments that he made:

6. I am also responsible for paying all the bills in my household. I was responsible for making the monthly mortgage payment to Ocwen. Ocwen provides a phone payment system which I used to make all my mortgage payments. I personally made all the payments and attach a record of those payments as Exhibit 2. Exhibit 2 shows all the payments I made on my home loan since June 15, 2012.

7. Ocwen charged me a fee each time I used the phone payment system. Each time I called Ocwen to make a payment, I was told how much to pay. Then I paid the exact amount given to me, plus the fee.

8. When I called Ocwen to make a payment, the amount Ocwen told me to pay kept changing, and I did not know why. When I received a loan

modification in 2012, my total monthly payment was supposed to be $1,518.66, which included escrow amounts. However, as set forth in Exhibit 2, the payments I made after the modification were well in excess of that amount.

9. Around May 27, 2015, I spoke with an Ocwen representative who told me "Your problem is is [sic] that you've been overpaying."

10. On June 12, 2015, I spoke with my relationship manager at Ocwen about why my payment kept changing, the representative told me "You were making over the amount you needed to make" and told me that payments I made were being applied to principal when they should have been applied toward my regular mortgage payment.

{¶ 45} The payment-schedule table in the loan modification agreement shows that the total monthly payment (through April 1, 2017) would be $1,518.66. Of this amount, $788.71 is principal and interest and $729.95 is escrow. The payment histories attached to Ocwen's affidavit show that the total monthly payment did increase over time, and they show that the increases were in the escrow amount. But the loan modification agreement explicitly says that this could happen. Beside the escrow amount in the payment-schedule table it says, "adjusts periodically." The same is stated beside the total monthly payment amount in the table. And beneath the payment-schedule table, it says, "The Escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly." The agreement later gives the reasons for escrow adjustments:

Lender may, at any time, collect and hold Funds [the amount to pay the

escrow items] in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

(Section E, "Funds for Escrow Items," ¶ 4). (A substantively identical provision is in section 3 of the mortgage.)

{¶ 46} A cursory look at Ocwen's payment histories reveals that the payment amounts applied to principal and interest stayed fairly constant (changing by only a few dollars) but that the amount applied to escrow fluctuated. The Malishes do not allege any problem with the escrow calculations. So contrary to their claim, Ocwen did not breach the loan modification agreement merely because it demanded higher total monthly payments.

{¶ 47} As to the Malishes' claim that their payments were not properly applied, a cursory comparison of the list of claimed payments attached to their affidavit and the payment histories attached to Ocwen's affidavit suggests otherwise. Admittedly, the reason for each transaction listed in Ocwen's payment histories is not always clear. But it appears that the payments made by the Malishes were applied to their account. And the Malishes have not pointed to any particular payment as being misapplied.

{¶ 48} The Malishes fail to show that a genuine issue exists as to the amount of principal due. Their affidavit does not show that the monthly payments demanded by Ocwen were wrong or that they made proper payments and Ocwen misapplied them. Nor

does the affidavit show that they were overpaying.

**{¶ 49}** The second assignment of error is overruled.

### III. Conclusion

**{¶ 50}** We have overruled both of the assignments of error presented. Therefore the trial court's judgment is affirmed.

. . . . . . . . . . . . .

WELBAUM, P. J. and FROELICH, J., concur.


Copies mailed to:

Kimberly Y. Smith-Rivera
Stefanie L. Deka
Montgomery County Treasurer c/o Lynne Nothstine
Ohio Bureau of Employment Services
Ohio Bureau of Workers' Compensation
Hon. Mary Katherine Huffman